UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. 04-300 -33-MAP |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| JANET ASSELIN | ) | |

**DEFENDANT JANET ASSELIN'S SENTENCING MEMORANDUM**

In accordance with this Court's Procedural Order on Sentencing, Defendant Janet Asselin sets fort the following relevant considerations to this Court's sentencing decision.

I.   **Background**

Mrs. Asselin has pled guilty to two counts -- conspiracy to commit theft and filing a false income tax return. In the theft case, she has admitted to receiving goods and services paid for by her husband's employer (the Springfield Housing Authority "SHA"). In essence, she admitted to having SHA employees, "on SHA time," make improvements to her primary residence and her home in Chatham.

As part of her plea agreement, Mrs. Asselin has agreed to forfeit substantial assets – her Chatham home, worth more than $3,000,000, one-half the equity in her primary residence, a substantial amount of cash, a car, and a boat. And she also faces the reality that all but one of her sons (one has been sentenced to six months in a halfway house and six months home detention), as well as her husband, are going to prison for substantial amounts of time.

II.   **The Sentencing Frame Work**

In the post-*Booker* world of sentencing, the United States Sentencing Guidelines ("Guidelines") "are merely advisory, which means that a district court has considerable

1

leeway to impose a sentence that falls outside of the range suggested by the guidelines." *United States v. Robinson*, 433 F.3d 31, 35 (1st Cir. 2005). Now, courts are free "to impose non-guidelines sentences that override the guidelines, subject only to the ultimate requirement of reasonableness." *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006)(en banc).

In fashioning an appropriate sentence for Mrs. Asselin, this Court should first look to the Guidelines, although they are by no means controlling or the last word. *Id*. (explaining that Guidelines "continue to be an important consideration in sentencing that should be addressed in the first instance by the sentencing judge.") At this stage, this Court must resolve any factual or legal disputes necessary to calculating the Guidelines. *Id*. However, this is merely "the starting point" of this Court's sentencing analysis and Mrs. Asselin "is free to adduce reasons and facts to support" her request for a below-Guidelines sentence. *United States v. Saez*, 444 F.3d 15, 17 (1st Cir. 2006).

Next, this Court must consider "the sentencing factors set out in 18 U.S.C. § 3553(a), along with any other relevant considerations. *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). At this stage, this Court may consider factors that were previously discouraged or forbidden under the mandatory Guidelines. *See United States v. Smith*, 445 F.3d 1, 5 (1st Cir. 2006). For example, this Court may now consider Mrs. Asselin's age, family ties, and other collateral consequences to sentencing.

Finally, this Court must consider whether the Section 3553(a) factors weigh in favor of a sentence <u>below</u> that which is contemplated by the Guidelines. *See United States v. Wallace*, 461 F.3d 15, 32 (1st Cir. 2006). "The goal is to fashion `a sentence sufficient, but not greater than necessary' for the achievement of the legitimate objectives

of sentencing." *Dixon*, 449 F.3d at 203, *citing* 18 U.S.C. § 3553(a). To justify a below-Guidelines sentence, Mrs. Asselin need not show that her case is "extraordinary." *United States v. Rivera*, 448 F.3d 82, 85 (1st Cir. 2006). Indeed, this Court "is not bound to impose a sentence within the range the Guidelines recommend, of course, and may depart from it if it reasonably concludes that the other § 3553 factors warrant such a departure." *Robinson*, 433 F.3d at 35.

Here, a review of the Guidelines, Mrs. Asselin's offense, her age, the role she plays in caring for her grandchildren (whose fathers are or will be serving sentences from this case) as well as the other Section 3553 factors militate in favor of a probationary sentence.

### A. This Court Should Apply a Four-Level Downward Adjustment for Mrs. Asselin's Minimal Roles in the Theft and Tax Counts.

As set forth below, Mrs. Asselin played a minimal role in the two counts of conviction and her Guidelines calculations should be adjusted accordingly.

#### 1. Mrs. Asselin Played a Minimal Role in The Theft Count.

In Paragraph 282, the PSR recommends, and the prosecution agrees, that the Court apply a two-level downward adjustment for Mrs. Asselin's minor role in the theft scheme. In fact, Mrs. Asselin submits, she was a minimal participant and thus, should receive a four-level adjustment.

Application Note 4 states that U.S.S.G. § 3B1.3(a) "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant."

3

Here, there were a number of participants in the theft conspiracy. But the PSR's description of the offensive conduct makes it clear that Mrs. Asselin was a minimal participant. She was plainly among the least culpable in the theft scheme -- unlike Mr. Asselin or Mr. Sotirion, she was not a leader or organizer of the scheme, nor did she have any sort of management role whatsoever. Indeed, she was not even aware of the full extent of the theft scheme. Moreover, she did not direct anyone at SHA to purchase any items, nor is there evidence that she asked Mr. Asselin to do so. Indeed, in many instances, as stated in her Objections to the PSR, she did not even know that SHA paid for items purchased for the Asselins, *e.g.*, paper products and paint. She did not direct Mr. Maroney to falsify purchase orders, and had no role in the inner workings at SHA. Further, Mrs. Asselin did not direct any SHA employee to do any work on her behalf, nor is there evidence that she asked Mr. Asselin to do so. Finally, there is no indication that she knew of Mr. Sotirion's involvement and role in the scheme.

### 2. Mrs. Asselin Played a Minimal Role in The Tax Count

Paragraph 288 indicates no adjustment for Mrs. Asselin's role in the tax offense (the filing of a false joint tax return with her husband). In the plea agreement, however, the prosecution agreed that Mrs. Asselin <u>should</u> receive a two-level downward adjustment for her minor role in the offense. Mrs. Asselin requests that the PSR be amended to reflect a four-level downward adjustment because she actually played a minimal role in the offense.

U.S.S.G. § 3B1.2(b) provides that a four-level downward adjustment is appropriate where a defendant is a minimal participant in criminal activity. Here, Mrs. Asselin played a minimal role in the tax offense: In essence, she did no more than sign

the return. She did not prepare the return, the Asselins' accountant did. She did not provide the accountant with information concerning their income; in fact, she did not even know what income was listed on the return. She did not review the return once it was drawn up. Further, she did not get involved with the details of renting out the Chatham property, rental of which was one of the items not reported on the return,[1] nor was she aware of the full extent of the theft or bribery schemes, the other sources of income not included on the return.

### C. This Court Should Not Apply a Two-Level Adjustment for Obstruction of Justice.

In Paragraphs 253 through 267, the PSR describes what it calls an "Obstruction of Justice Scheme." It sets forth several instances where Mrs. Asselin allegedly obstructed justice. An examination of those allegations, however, reveals otherwise.

#### 1. The "Destruction of Evidence" Allegations

In Paragraph 254, the PSR alleges that Mrs. Asselin obstructed justice by participating in efforts to get rid of cans of paint that had been paid for by SHA. As she stated in her objections to the PSR, Mrs. Asselin, however, did not know that SHA had paid for the paint. As such, the cited conversation does not show that Mrs. Asselin was part of any scheme to obstruct justice.

#### 2. The "Counseling to Lie" Allegations

Next, the PSR alleges that Mrs. Asselin counseled Lisa Asselin to lie, an allegation she strongly denies. To support the allegation, the PSR cites a conversation among Mrs. Asselin, her husband, and Lisa Asselin. The PSR states that "Lisa Asselin

---

[1] Also, as stated in her objections to the PSR, she denies that the income from the Chatham properly totaled $20,000.00.

5

knew that Asselin, Sr. and Janet Asselin were instructing her to say that she had no knowledge about home improvements, which she knew to be false." PSR, ¶ 261. Mrs. Asselin, however, did not instruct Lisa to lie. Rather, she was merely repeating what Lisa Asselin had said, *i.e.*, that she did not make payments for improvements that had been made to her home, but instead, made the payments for the household's monthly bills. As such, the cited conversation does not show that Mrs. Asselin was part of any scheme to obstruct justice.

### 3. The "Dead Men Can't Talk" Allegations

The PSR further alleges that Mrs. Asselin obstructed justice because, shortly after receiving a grand jury subpoena, she said to her daughter, "We need to get together on this." PSR, Para. 267. Mrs. Asselin denies that she had any ill intent when she said, "We need to get together on this." She merely meant that, in light of the situation (the issuance of the grand jury subpoenas), the Asselin family women should get together and talk about what was going on. At a minimum, this conversation is ambiguous and should not be used to increase Mrs. Asselin's sentence.

### 4. The "Destruction of Campaign Records" Allegations

Finally, the PSR alleges that Mrs. Asselin obstructed justice by destroying certain records from her son Christopher's political campaign. PSR, ¶ 265. In the cited conversation, Mrs. Asselin said it was a "mistake" not to record cash contributions to the Christopher Asselin campaign and that, at one time, she had a list of such contributors "but after we had our visitors in the fall [the FBI], I got rid of the list because I was afraid of [unintelligible] the list." Mrs. Asselin's conduct, however, does not fall within the Guidelines' definition of obstruction.

6

U.S.S.G. § 3C1.1 provides for a two-level upward adjustment if a "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction…." (emphasis added). "The plain language of the relevant portion of the provision requires that the obstructing conduct occur `during the investigation … of the instant offense' – that is, the offense of conviction." *United States v. Bagwell*, 30 F.3d 1454, 1458 (11th Cir. 1994). "The language of Sec. 3C1.1…does not encompass any and all obstructive conduct that a defendant may have attempted or committed; instead, it applies only to willful attempts to obstruct or impede the administration of justice [in relation to] the instant offense." *Id.* (brackets in original; citation and internal quotation marks omitted). "[T]he term "instant offense" refers solely to the offense of conviction…." *Id.; United States v. Woods,* 24 F.3d 514, 516 (3rd Cir. 1994)("…this adjustment applied only when the defendant has made efforts to obstruct the investigation, prosecution, or sentencing of the offense of conviction.")(emphasis added); *accord*, *United States v. Perdomo*, 927 F.2d 111, 118 (2d Cir. 1991); *United States v. Dortch*, 923 F.2d 629, 632 (8th Cir. 1991); *United States v. Roberson*, 872 F.2d 597, 609 (5th Cir.), *cert. denied*, 493 U.S. 81 (1989).

In keeping with these principles, the First Circuit has held that it was error for the sentencing court to apply this adjustment where a defendant provided a false name to arresting officers who had been investigating the defendant's use of a false social security number because, the First Circuit reasoned, that charge was dropped, and officers did not begin the investigation into the offense of conviction (unauthorized use of credit cards) until a later time. *United States v. Yates*, 973 F.2d 1, 4-5 (1st Cir. 1992). The same

reasoning applies here – the alleged obstruction by destroying a list of cash contributors has absolutely nothing to do with the investigation being undertaken at the time – the theft of SHA resources.

Application of this rule to the instant case leads to the conclusion that the obstruction of justice adjustment cannot be properly applied here. To be sure, the "instant offense[s]" – *i.e*, the offenses of conviction -- have nothing whatsoever to do with any violations of state campaign laws. Mrs. Asselin has pled guilty to conspiracy to commit theft, and filing a false income tax return.

Further, Application Note 4 states that "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is <u>material to an official investigation</u>" is an example of obstructive conduct (emphasis added). Here, however, the alleged obstructive conduct – disposing of the list of cash contributors – was not material to an official investigation. Indeed, at the time she destroyed the list of contributors (in February, 2003), it does not appear that the FBI was investigating alleged violations of state campaign laws. When FBI agents searched her home just months before (in September, 2002), they left a copy of the search warrant with the Asselins. That warrant describes documents and evidence which were material to the official investigation. Documents or evidence related to Massachusetts state campaign finance laws were not listed anywhere on the warrant's description of items to be seized. In any event, even if the list of cash contributors was material to the FBI investigation, Mrs. Asselin had no reason to believe that the FBI was investigating what ordinarily amounts to a civil infraction, *i.e.*, a violation of a state campaign finance provision.

8

**D. The Factors Under 18 U.S.C. Sec. 3553(a) Weigh in Favor of Leniency.**

*Booker* teaches that this Court also must now consider factors it could not have considered under the mandatory-Guidelines regime – specifically, those factors set forth in 18 U.S.C. § 3553(a). After considering these factors, as well as the Guidelines, this Court is free "to impose [a] non-guideline sentence[] that override the guidelines, subject only to the ultimate requirement of reasonableness." *Jimenez-Beltre, supra* at 518. "Assuming a plausible explanation and a defensible overall result, sentencing is the responsibility of the district court." *Id*. at 519.

In accordance with 18 U.S.C. § 3553(a), this Court must consider the following factors before imposing Mrs. Asselin's sentence:

- The nature and circumstances of Mrs. Asselin's offenses;

- Mrs. Asselin's personal history and characteristics;

- Mrs. Asselin's need for training, education, and services; and

- The need for the sentence imposed, in light of:
    - The seriousness of Mrs. Asselin's offenses;
    - Deterrence considerations;
    - Concerns of recidivism; and
    - The need to protect the public from Mrs. Asselin.

This Court is also free to consider other relevant factors, including those previously discouraged or even forbidden by the Guidelines. Here, combinations of these factors militate against an incarcerated sentence.

**1. The Nature and Circumstances of Mrs. Asselin's Offense**

Mrs. Asselin has pled guilty to conspiracy to commit theft and filing a false income tax return. Both are no doubt serious offenses, but as described above, Mrs. Asselin was a minimal participant.

This Court should also consider that Mrs. Asselin was highly instrumental in bringing about the global plea agreement that has saved significant time and resources for this Court and the prosecution.

**2. Mrs. Asselin's Personal History**

Mrs. Asselin is 70 years old, and, fortunately, is in rather good health. She takes regular medication for osteoporosis and cholesterol.

Mrs. Asselin met her husband while a college student and they have been married for 48 years. Together, they raised five children, all of whom live in or around Springfield: James (age 47), Raymond, Jr. (age 45), Joseph (age 43), Maria (age 41), and Christopher (age 37). With the exception of Ray, Jr. (who did not attend), the Asselins helped each of their children obtain college degrees, and some went on to complete master's programs.

The Asselin family is large, and by all accounts, close-knit. James has 3 children: Timothy and Elizabeth, who are twins and age 20, and James Jr., who is 14. James' family lives close by in Springfield. Joseph has four children: Joseph, Jr., age 17, Patrick, age 16, Cassandra, age 13, and Daniel, age 12. Joseph's family lives in Amherst. Maria – a widow and single mother – has two children, Alexander, age 17 and Nicholas, age 12. Maria's family lives in Ludlow. Christopher, who lives in Springfield, has twins, Janet and Jacquelyn, age 5.

Mrs. Asselin, who stayed home to raise her family, has always been an exemplary caretaker with compassion and empathy for her family and others in need. For example, she spends approximately 20 hours a week caring for Maria's children so that Maria can attend school at night to obtain her master's degree in social work. Without Mrs.

Asselin's assistance, Maria would be left without child care and it would be virtually impossible for her to continue with her schooling.

Her daughter Maria writes, "My mother was and continues to be the most truly committed and devoted, loving wife and mother. Her needs have always been secondary and she has freely sacrificed her needs over that of her husband and children. Her motto was always, `seeing my family happy is all I need in life.'" Exh. A. Maria's friend, Regina Murray Downey, explains that after Maria's husband died, Mrs. Asselin "has been a constant presence in their lives and has done her utmost in helping Maria. These boys have suffered the loss of their father and I am concerned and worried as to their ability to cope with another loss of such an important and significant figure in their lives. I would simply ask that you take into account all the good that Mrs. Asselin has done throughout her life, and the impact your decision will have on her grandchildren, particularly Nik and Alex [Maria's children]." Exh. B.

Mrs. Asselin also spends considerable amounts of time with James, Jr., spending at least one or two days a week at his house. She has done so since his father was incarcerated in 2003. Her presence has helped give him guidance and support in the absence of his father.

Mrs. Asselin's devotion to her family does not end there. All of her children and grandchildren live in Springfield or the surrounding towns. She and Mr. Asselin are frequent guests at their children's homes, and every Sunday, practically the whole family comes to the Asselin house, arriving for breakfast and staying through dinner. They have remained a close family, despite the turmoil in their lives as a result of this case.

11

Her granddaughter Elizabeth writes about the very special bond she shares with her grandmother and old-fashioned family values. Elizabeth fondly remembers that, when it came time to the weekly Sunday meals, Mrs. Asselin would prepare brunch, then almost immediately begin making dinner. *See* Exh. C. Elizabeth reminisces that "[w]hen I was a little girl, I used to love to help grandma make supper....I have learned so much by watching and helping Grandma cook. Most importantly, I have had so much fun. Even now, when I come home from school, I look forward to going to grandma's on Sunday and having some real food. I am so grateful for my grandma's patience for me in the kitchen." Elizabeth explains the pride that Mrs. Asselin takes in caring for her family: "she diligently works to satisfy everyone with a smile on her face. She takes great pride in knowing all her family is happy and would sacrifice everything to ensure that happiness." Elizabeth goes on to say, "I love cooking with my grandma and I love spending time with her. I can honestly say she doesn't have a corrupt bone in her body." *Id.* As Elizabeth so succinctly puts it, "everything she does is for others.... She is the cornerstone of our family. We all have been through so much. Through it all there has always been one thing we can count on, grandma." Elizabeth also praises her grandmother for taking the time on a regular basis to visit Elizabeth's father, who has been incarcerated since 2003. Elizabeth concludes her heart-felt genuine letter by saying, "So please, when sentencing my grandmother, keep in mind that she is a wife, a mother and a grandmother. She means so much to so many people." *Id.*

Mrs. Asselin's grandson Tim also took the time to write to this Honorable Court. He writes, "My grandmother is a very nice person. There is not a mean bone in her body. She is willing to help anyone in anyway she can. Along with that she is the type of

12

person who puts a smile on your face when you are sick or down." Exh. D. "[She] has always been there for my family, cousins, aunts, uncles, and me. She has a huge heart. If there is something we need (like a good meal), or something we need done (like my wash), she is willing to put aside previous tasks to help me, and that does not just go for me, it goes for everyone." *Id.* Tim also explains the positive influence that Mrs. Asselin has had on his development into a young man: he writes, "I feel without my grandmother's guidance and learning from her, I would not be the same person I am today. I am very proud and happy of the person I am. This is because I feel I reflect my grandmother. She is an extremely hard working person who never gives up." *Id.* She has taught him "to be respectful, hard working, and most importantly, a good person!" *Id.* Tim's letter goes on, extolling his grandmother's many virtues. Perhaps the most telling thing he writes is that "She goes above and beyond. That is what makes her so special – the fact she is willing to go above and beyond for the sake of others." *Id.*

And Mrs. Asselin's good character, empathy, and deep concern for others have shown through in other ways. In the 1990s, Mrs. Asselin cared for her mother, who had congestive heart failure, until her death in 1998. From the mid-1970s to 2002, Mrs. Asselin cared for her father, who had Alzheimer's disease. Due to her attention and care, he was able to remain at home until the last few years of his life, when his condition deteriorated to the point where he had to be placed in a nursing home. And even then, she continued to care for him, visiting him for hours and hours each day. Her grandson Tim explains in his letter that "[s]he was wonderful to [her parents]….often spending the majority of her days at their houses or nursing homes, taking care of them and keeping

them company. I don't know how she did it….She gave them everything she could." Exh. B.

Her devotion extended beyond her own children and grandchildren. She also helped to care for her sister-in-law, who suffered from a debilitating mental illness as well as physical infirmities. She cared for her mother-in-law, who had colon cancer. She provided medical attention to her on a daily basis, changing her colostomy bag, keeping her company, and making sure she took her medicines. She helped care for a sick neighbor with kidney disease, frequently taking her to the hospital for dialysis treatment.

Mrs. Asselin has always prided herself on her family and taking care of her children and grandchildren. Since the indictment in this case, however, she has had to find work. She has a position at her son Joseph's insurance agency, doing general clerical work and answering the telephones. The family needs what little income she earns to get buy, particular since her husband lost his pension, and in light of his age and poor health.

Over the years, Mrs. Asselin has also been involved in charity organizations. Every year, she gets involved in the American Cancer Society fundraiser, collecting donations and helping with volunteer work, such as "stuffing" envelopes. Before her church parish closed, she was on the Parish Council for many years. She was in charge of religious education classes for children and ran the religious confirmation program. Twice she served as president of the Parish Council. In the 1990s, she received the Pius award for exceptional charitable work. She was on the parochial school board in the 1980s and early 1990s while her children attended the local parish school. She was also an active member of a social group of women of French ancestry, serving as president for

two years. That group was involved in various charitable endeavors, such as visiting elderly folks in nursing homes and raising funds for local charities.

In short, Mrs. Asselin's transgressions in this case are an aberration. She has led a law-abiding, admirable life, always putting the needs of others before her own. By all accounts, Mrs. Asselin is a kind, loving person who puts the needs of others before her own and certainly is not the average defendant who stands before this court. Her exemplary life weighs heavily in favor of leniency.

### 3. Mrs. Asselin's Need for Training, Education, and Services

In light of her age and education, Mrs. Asselin does not need any training or education. As such, this factor weighs against an incarcerated sentence.

### 4. Mrs. Asselin Poses No Risk of Recidivism

Mrs. Asselin has no prior record and, aside from the instant offenses, has been a law-abiding citizen for 70 years. In light of her personal history and circumstances described above, she poses no risk of recidivism, and there is no need to protect the public from her. Thus, this factor also weighs against incarceration.

### 5. Mrs. Asselin's Conviction Has Resulted In Other Adverse Consequences.

By pleading guilty, Mrs. Asselin faces far more than the possibility of going to prison. Indeed, she has had to endure seeing not just her husband, but each one of her children face criminal charges, seeing each one of her sons sentenced, and knowing that many of her grandchildren will face the next few years without their fathers. As her grandson Tim writes, "My grandmother has suffered enough, watching her close loving family grow to be divided. She has seen my grandfather lose everything he loved, his beloved job, his close knit family, good name, and dignity." Exh. B.

Pleading guilty has ruined Mrs. Asselin's good reputation in the community and has served as a great source of embarrassment. And, it also has had an enormous financial impact on Mrs. Asselin, who has lost any prospect of financial security for the remainder of her life. Notably, Mrs. Asselin agreed to forfeit over three million dollars in assets. She has also lost the income from her husband's pension, including his own contributions. In essence, she has lost everything that she and her husband have worked for, and has a dismal financial situation ahead of her.

### III.   CONCLUSION

For these reasons, Defendant Janet Asselin respectfully requests that this Honorable Court impose a probationary sentence.

Respectfully submitted,

/s/ Richard M. Egbert
Richard M. Egbert (BBO No. 151800)
Patricia A. DeJuneas (BBO No. 652997)
Law Office of Richard Egbert, P.C.
99 Summer Street, Suite 1800
Boston, MA 02110
Tel: (617) 737.8222

### CERTIFICATE OF SERVICE

I, Richard M. Egbert, hereby certify that I served the foregoing document upon William Welch, Esq., Assistant United States Attorney, Office of the United States Attorney, 1550 Main Street, Room 310, Springfield, Massachusetts 01103 by first class mail, postage prepaid, on this 20th day of February, 2007.

/s/ Richard M. Egbert
Richard M. Egbert

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CRIM. NO. 04-300 -33-MAP** |
| | ) | |
| vs. | ) | |
| | ) | |
| **JANET ASSELIN, et al.** | ) | |
| | ) | |

_____

**EXHIBITS A-D TO THE SENTENCING MEMORANDUM HAVE**

**BEEN FILED WITH THE CLERK'S OFFICE ON PAPER**

17