UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-30033-MAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JANET ASSELIN, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM FOR DEFENDANT JANET ASSELIN

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files the Government's Sentencing Memorandum For Defendant Janet Asselin.

The government respectfully submits that the defendant warrants a sentence of 10 months incarceration, constituting the low end of the defendant's advisory guideline range, and a fine of $30,000.00, constituting the high end of the defendant's advisory guideline range. The defendant's request for a non-Guidelines sentence based on the factors set forth in 18 U.S.C. § 3553(a) should be rejected. See Defendant Janet Asselin's Sentencing Memorandum ("Memo") (Docket No. 410).

I.    The Defendant's Offense Conduct

    A.    Introduction

As set forth in far greater detail in the Pre-Sentence Report dated November 3, 2006 and revised February 21, 2007 (the "PSR"), the defendant participated in a vast and damaging series of crimes centered around the corrupt operation of the Springfield Housing Authority (the "SHA") by her husband, Raymond Asselin, Sr.  Together with her husband and others, the defendant looted the SHA through a longtime pattern of theft.

In particular, the defendant pleaded guilty to the following charges in the Second Superseding Indictment (the "Indictment"): conspiracy to commit theft against the government, in violation of 18 U.S.C. §§ 370 and 641 (Count 85); and filing a false income tax return, in violation of 26 U.S.C. § 7206(1) (Count 109).

    B.    The Defendant's Theft Conspiracy

In connection with the theft conspiracy charged in Count 85, the defendant played a substantial role in the pillaging of the SHA by a variety of means.  First, the defendant garnered many items and services for her Springfield and Cape Cod homes.  See Government's Sentencing Memorandum for Defendant Raymond Asselin, Sr. (Docket No. 413).  For example, as Lisa Asselin testified at trial in United States v. Peter Davis, CR-04-30033-MAP, SHA paid for a substantial part of the defendant's renovations to her Springfield home:

> They had their house painted.  They had the
> new rugs put in.  She [the defendant] had her

> kitchen redone and changed around a little bit
> and they got all new appliances, a granite
> countertop with the sink, a new window put in,
> then a new air conditioning unit.  And then
> they had their -- their house was made of
> brick and it was pointed and they had someone
> come over and re-point it and a new air
> conditioning unit.

Testimony of Lisa Asselin, Transcript of Trial ("T.") at 1568-69.

Second, as the matriarch of the Asselin family, the defendant hosted regular Sunday breakfasts and dinners where the defendant's five children and their spouses openly spoke of the free items that they had received, either from SHA itself or a cadre of corrupt contractors.  See, e.g., PSR ¶ 96-96 (providing accounts of both Lisa Asselin and Ann Asselin).  As Lisa Asselin testified, the defendant ensured that these gatherings were regularly attended by all family members:

> If you didn't show up at dinner, my
> mother-in-law would be upset and she would --
> when you go to dinner, you find out different
> things that are going on with different family
> members.  And if there was anything going on
> in the city or any events that were happening,
> my father-in-law would frequently get tickets
> so that we could all go.  And if you didn't go
> to breakfast or dinner, you would not get the
> tickets to be able to go to these events.  And
> she would be upset with you if something was
> going on at somebody's house and you said, oh,
> I didn't know about that.  She would say,
> "Well, if you showed up at dinner you would
> know."

Testimony of Lisa Asselin, T. at 1543-44 (emphasis added).

Moreover, it was a "regular" part of the Asselin family gatherings to discuss the items and work that the family members were being provided for free:

> During our family conversations and on Sunday dinners, my father-in-law would bring home books, catalogs with different like fixtures and you'd pick out the cabinets for the kitchen, a cabinet book, and he would tell us to pick out the color and the type of cabinets that we needed and to write it down and he would take care of it. The same with the tile. He told us what tile floor to go to and to give him the number of the tile that we were interested in. He would ask us to go to Serve-U and pick out fixtures and wallpaper and just write the numbers down, bring them back and he would take care of that.

Testimony of Lisa Asselin, T. at 1547-48.

For example, Lisa Asselin testified that she knew SHA had supplied materials and other items for her sister-in-law's home construction projects "[f]rom family discussions and being involved with Maria [Serrazina] on picking out different colors and my mother-in-law. We all got a hand in choosing what was going to go in and how things looked." Testimony of Lisa Asselin, T. at 1548 (emphasis added). See also ¶ 208 (the defendant "invariably" accompanied family members to pick out paint, wallpaper, or tile).

According to SHA's chief procurement officer, Francis Maroney, the defendant's husband "routinely instructed him to purchase personal items for members of the Asselin and Sotirion families, and then bill those items to SHA." PSR ¶ 194. When the materials arrived, Maroney often dropped them off at the defendant's

4

Springfield home, where he was frequently greeted by the defendant herself. PSR ¶ 196. The items included paint, wallpaper, tile, electrical fixtures, lumber, power tools, wet-dry vacuums, snowblowers, ice melt, fertilizer, rakes, snow shovels, picture frames, rolls of film, picnic tables, and other items. PSR ¶¶ 195, 198-200, 203-04.

Several co-conspirators recalled that the defendant complained about when Maroney obtained the wrong items. Maroney recalled that the defendant was "very particular" about requiring nine-inch paper plates, since he was once berated by the defendant's husband, who told Maroney that the defendant was "very unhappy" that he had procured the wrong size. PSR ¶ 201. Lisa Asselin similarly recalled that the defendant complained about Maroney bringing the wrong items to her Springfield home. PSR ¶ 207.

Lastly, consensual recordings made by Lisa Asselin demonstrated that the defendant knew that her children had illicitly received from SHA items such as "a deck" and "a roof." PSR ¶ 210.

C.    The Defendant's Tax Fraud

In connection with the tax fraud charged in Count 109, on or about April 15, 2000, the defendant falsely filed her 1999 federal income tax return (Form 1040) by failing to report substantial additional income received from bribes, stolen vending machine quarters, goods and/or services paid by the SHA, and income from the rental of 56 Stage Island Road, Chatham, MA.

5

II.  <u>The Defendant Does Not Warrant A Minimal Role</u>

The defendant merits the two-level minor role reduction provided in the PSR, and no more. PSR ¶ 282. A defendant who seeks a downward adjustment stemming from a claimed peripheral role in the offense bears the burden of proof. <u>United States v. Ocasio</u>, 914 F.2d 330, 332-33 (1st Cir. 1990).

As Application Note 4 to Section 3B1.2 makes clear, the four-level minimal role reduction "is intended to cover defendants who are <u>plainly among the least culpable</u> of those involved in the conduct of a group. . . . It is intended that the downward adjustment for a minimal participant will be <u>used infrequently</u>." U.S.S.G. §3B1.2, Commentary, Application Note 4 (emphasis added).

The defendant's theft offense is not one of those rare instances where a minimal role is appropriate, since: (1) the defendant received through the theft conspiracy numerous and substantial benefits to her Springfield and Cape Code homes over a long period of time; (2) she organized regular Sunday conclaves wherein the family's thefts were openly discussed; (3) she helped family members select items to be stolen from SHA; (4) she personally received stolen items from Francis Maroney, and occasionally even complained about the items that he had procured; and (5) she subsequently attempted to obstruct the FBI's investigation into the theft.

Neither does the defendant warrant a role adjustment in the tax fraud since she played a role equal to her husband's in signing the fraudulent tax form.

III. <u>The Defendant Merits An Obstruction Of Justice Enhancement</u>

The defendant warrants the two-level obstruction enhancement provided by the PSR.  PSR ¶ 284.  First, after Lisa Asselin had received a grand jury subpoena, the defendant counseled her to lie about the theft of SHA labor (i.e., the stolen time of SHA carpenter Frank Higgenbotham, who constructed Lisa Asselin's deck on the SHA clock):

> Ray, Sr.: On the construction end, there's really nothing that you know anyway except for the deck that you know Frank did it off duty.
>
> Lisa:     It was weekends.
>
> Ray, Sr.: Weekends.
>
> Lisa:     He was here Saturdays.
>
> Ray, Sr.: How much did he pay for it?  I have no idea. My husband takes care of all those.  Don't you write checks?
>
> Lisa:     I do all the bills.
>
> Ray, Sr.: You do your monthly bills.  You don't do your big ones.
>
> Janet:    He asked me same questions.
>
> Lisa:     I do everything.
>
> Ray, Sr.: Well, you don't . . .
>
> Janet:    <u>Well, don't say that</u>.
>
> Ray, Sr.: Not, not, not this.

> Lisa:      Oh okay, okay.
>
> Ray, Sr.: This is different.
>
> Lisa:      I don't do home improvements.
>
> Janet:     <u>You do your monthly bills</u>.

PSR ¶ 261 (emphasis added).  In this exchange, the defendant and her husband are clearly coaching Lisa Asselin to testify that she only does her monthly bills, rather than the "big ones" that could have paid for construction work, such as her deck.[1]

Second, the defendant participated in conversations in which family members discussed destruction of evidence, such as the removal SHA paint cans from their homes.  PSR ¶ 254 (defendant stated that she was "upset . . . because I wanted the names off it" before the cans were removed, so she would know which type of paint was used).[2]

Third, the defendant participated in the concealment and/or destruction of evidence, including a list of campaign contributors and a briefcase containing approximately $286,000 in illicit cash,

---

[1]  Although defense counsel claims that this conversation does not show that the defendant was instructing Lisa Asselin to lie, Memo at 6, a plain reading of the conversation demonstrates otherwise.

[2]  Although defense counsel claims that the defendant did not know that SHA had paid for the paint, Memo at 5, several witnesses (including two of the defendant's own daughters-in-law) indicated that the defendant knew that SHA routinely paid for paint and other items.

of which approximately $239,000 was initially recovered.  PSR ¶¶ 256, 265.

In February 2003, a few months after the FBI executed search warrants at Asselin family homes in the fall of 2002, the defendant was captured in a consensually recorded conversation stating: "[A]ctually I had a list of all of, most of these people, but after we had our visitors in the fall, I got rid of the list, because I was afraid of [UI] the list."  PSR ¶ 265.[3]

Similarly, in an effort to avoid the seizure of the cash from the ongoing FBI investigation, the defendant helped relocate the cash-laden briefcase from her house to her son's.  As Lisa Asselin testified at the <u>Davis</u> trial:

> I went over to <u>my mother-in-law's</u> that evening not knowing that Jim [Asselin]'s house had been searched and <u>she</u> said to me "I just want you to know that daddy cleaned out the safe and brought everything to your house," and I was like, okay.  And when I got home, I proceeded to ask Ray, Jr. what did your father bring over.  And he said he put a briefcase in our attic, and he wanted to go look inside the briefcase and I didn't want to go look inside the briefcase but he proceeded to have me go upstairs with him and open the briefcase.

---

[3]    The defense contends that because this obstructive conduct did not pertain to the defendant's offense of conviction (i.e., theft), it cannot justify the enhancement.  Memo at 6-8. However, because the campaign finance fraud involved contributions from bribe-paying corrupt SHA contractors, campaign expenses that were "funnelled" through SHA by stolen SHA labor and materials, and the transportation of SHA residents that was not listed as an in-kind contribution, PSR ¶¶ 229-235, a suffiicent nexus exists between the defendant's destruction of the list and her offense of conviction.

T. at 1593-94 (emphasis added).

IV.  <u>The Defendant Warrants A Guidelines Sentence</u>

The government respectfully submits that the factors set forth in 18 U.S.C. § 3553(a) all warrant a sentence at the low end of the guidelines range (i.e., 10 months) rather than any reduction from the guidelines range.

A.  <u>Nature And Circumstances Of The Offense</u>

The nature and circumstances of the offense warrant a Guidelines sentence. As set forth above, the defendant participated in a wide and longstanding pattern of theft from an essential Springfield institution. The defendant also repeatedly obstructed justice by participating in the destruction or concealment of evidence and counseling witnesses to lie.

Given the seriousness of the underlying offenses and the defendant's central role, the nature and circumstances of the offense require a Guidelines sentence. <u>See</u> 18 U.S.C. § 3553(a)(1).

B.  The Defendant's History And Characteristics
<u>Warrant A Guidelines Sentence</u>

The personal characteristics of the defendant weigh in favor of a Guidelines sentence. Unlike most defendants who come before this Court, the defendant has enjoyed a life of rare privilege and affluence, and had absolutely no financial need to commit her crimes.

The defendant was raised in "an emotionally and economically secure environment." PSR ¶ 305. In short order, the defendant

graduated college, got married, and then purchased two residences, including a summer home on Cape Cod.  PSR ¶¶ 309-10.  In 1993, the defendant's husband and his siblings inherited two commercial buildings in Chicopee.  PSR ¶ 310.

The defendant has enjoyed good physical health and currently takes medication only for osteoporosis and cholesterol.  PSR ¶¶ 314. The defendant has no history of mental health problems, or drug or alcohol addictions.  PSR ¶ 315-16.  As the defendant concedes, she is embraced by a broad network of family who remain "close-knit" in spite of the instant prosecution.  Memo, at 10.

In addition to the defendant's two residences, she (with her husband) also owns two vehicles and a boat.  She currently has a net worth of approximately $3.8 million; even subtracting the assets that the defendant will be forfeiting, she still has a substantial net worth, much of which is contained within bank or investment accounts.  PSR ¶ 321.

In sum, the defendant's life reveals no extenuating circumstances that might have motivated her to commit her crimes. Instead, as an educated person of relative affluence, the defendant well knew right from wrong and had absolutely no financial need to commit the crime.  Thus, it appears that only her naked arrogance and greed motivated her to commit her crimes.  As a result, her personal circumstances aggravate, rather than mitigate, the seriousness of her crimes.  At the very least, her history and

characteristics warrant a sentence at the low end of the guidelines range.  See 18 U.S.C. § 3553(a)(1).

C.  The Need for the Sentence Imposed

A Guidelines sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

Here, the defendant participated in offenses that gravely harmed the SHA and its needy tenants, its contractors, and its administrators, and then demonstrated blatant disrespect for the law by repeatedly obstructing the investigation into these crimes.

In this case, where the defendant participated in a series of crimes marked by naked greed and brazen disrespect for the law, only a Guidelines sentence will promote "respect for the law" and "provide just punishment."  18 U.S.C. § 3553(a)(2)(A).  Moreover, a Guidelines sentence would provide general deterrence for others similarly situated in society.  See 18 U.S.C. § 3553(a)(2)(B).

D.  Restitution

As contemplated by Paragraph 6 of the Plea Agreement, the defendant has or will transfer to the United States the cash equivalent of her Springfield, MA home; her Cape Code home; approximately $243,650 in cash that was seized during the investigation; her 2002 BMW vehicle; and her twenty-three foot Chaparral pleasure boat.  These properties will then be transferred to, or sold for, the benefit of the SHA.

The Plea Agreement specifies that "[t]he transfer of assets for restitution set forth herein shall <u>not satisfy or offset any fine, cost of imprisonment, or other penalty imposed upon Defendant</u>, except as set forth in this paragraph, nor shall the transfer of assets for restitution be used to offset Defendant's tax liability or any other debt owed to the United States." Plea Agreement, ¶ 6, at page 7 (emphasis added). Thus, the defendant's tender of restitution does <u>not</u> offset any fine that the Court may impose.

E.   <u>Fine</u>

The government respectfully requests that the Court impose a fine of $30,000.00, constituting the high end of the defendant's guidelines fine range. U.S.S.G. §5E1.2(c)(3). Such a fine signals to this defendant, the general public, and others tempted to engage in corrupt behavior, that crime does not pay.

III. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks that the Court impose a sentence of 10 months and a fine of $30,000.00.

Filed this 27th day of February, 2007.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


  /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                              Springfield, Massachusetts
                                           February 27, 2007

        I, Steven H. Breslow, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by electronically
filing said motion to:

Richard Egbert, Esq.
99 Summer Street
Boston, MA 02110
Counsel for defendant Arthur Sotirion


                           ___/s/ Steven H. Breslow_____
                           STEVEN H. BRESLOW
                           Assistant United States Attorney

15